USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: ___09/14/2021___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

**WILLIE JAMES SANDERS,**                             :
                                                      :
                                   **Plaintiff,**     :
                                                      :        **20-cv-2229 (ALC)**
               **-against-**                          :
                                                      :        **OPINION & ORDER**
**COMMISSIONER OF SOCIAL SECURITY,**                  :
                                                      :
                                   **Defendant.**     :
                                                      :
                                                      :
------------------------------------------------------------------- x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Willie James Sanders brings this action challenging the Commissioner of Social

Security's ("Commissioner" or "Defendant") final decision that Plaintiff was not entitled to

disability insurance benefits ("DIB") under Title II of the Social Security Act and supplemental

security income ("SSI") under Title XVI of the Act. Currently pending before the Court are the

parties' cross motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). ECF Nos.

18-19, 23-25. The Court has considered the parties' submissions and for the reasons set forth

below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED**.

## BACKGROUND

**I.    Procedural History**

On May 20, 2013, Plaintiff applied for social security disability benefits ("SSD") and SSI

in connection with a disability allegedly beginning on February 5, 2013. R. at 18, 416-29.[1] The

Social Security Administration ("SSA") denied Plaintiff's claims on August 30, 2013. R. at 18,

---

[1] "R" refers to the Certified Administrative Record. Pagination follows original pagination in the Certified
Administrative Record. ECF No. 13.

152-55, 157-68. Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ") on September 18, 2013. R. at 18, 169.

On August 2, 2016, ALJ Robert Gonzalez commenced the social security hearing. R. at 52. Plaintiff appeared and testified in person, and was represented by his attorney Mr. Bellinowski. *Id*. Vocational Expert ("VE") Marian Marracco also testified. R. at 77-88. The ALJ rendered his decision on November 8, 2016, finding that Plaintiff was not disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. R. at 30. Plaintiff requested review of the ALJ's decision on November 29, 2016, and on March 24, 2017, the SSA Appeals Council denied his request for reconsideration. R. at 1-3, 12-14.

On May 23, 2017, Plaintiff filed a civil action in the United States District Court for the Southern District of New York challenging the SSA Appeals Council's decision. R. at 1574-77. On May 11, 2018, the Honorable United States District Judge William H. Pauley III so ordered the parties' stipulation reversing the decision of the Commissioner and remanding the case for further administrative proceedings, including further assessment of the medical opinion evidence. R. at 1579-80. On July 10, 2018, the SSA Appeals Council remanded Plaintiff's claim for a new hearing and decision. R. at 1450-55. A second hearing was held before ALJ Robert Gonzalez on March 5, 2019. R. at 1503-35. The ALJ determined that Plaintiff was not disabled. R. at 1418-37. Plaintiff requested review of the ALJ's decision and was denied reconsideration on January 15, 2020, rendering the ALJ's decision the final decision of the Commissioner of Social Security. R. at 1410-14.

On March 12, 2020, Plaintiff filed this action. ECF No. 1 ("Compl."). On February 16, 2021, Plaintiff submitted a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and an accompanying memorandum of law in support of his

motion ("Pl. Mot."). ECF Nos. 18-19. On April 19, 2021, Defendant cross-moved for judgment on the pleadings and submitted a memorandum of law in support of his motion and in opposition to Plaintiff's motion for judgment on the pleadings ("Def. Opp."). ECF Nos. 23-24. On May 10, 2021, Plaintiff submitted a reply memorandum of law in further support of his motion for judgment on the pleadings ("Pl. Reply"). ECF No. 25. The Court now considers the parties' motions.

## II.    Factual Background

### A.  Non-Medical Evidence

Plaintiff was born on June 19, 1958. R. at 431. Plaintiff has a GED and past relevant work experience as a sanitation truck driver. R. at 55-56, 1509-15, 1527-28.

#### 1.  Plaintiff's Testimony

##### i.    ALJ Hearings

At the August 2, 2016 hearing before the ALJ, Plaintiff testified that he had worked as a driver for Expert Drain Cleaning in 2014 and that in 2015 he had worked as a driver for Guski Logistics, Oak Beverages and a lumber supply company. R. at 56-59. Plaintiff left his job in 2015 due to problems driving, difficulty getting up from his seat, and frequent absences. R. at 58-59. In 2016, Plaintiff worked for Physical Express Services, and testified that he performed warehouse work on a conveyor belt. R. at 63. Plaintiff shared that he received $19,500 in a lawsuit settlement in 2011 as a result of being hired and fired from Home Depot USA on the same day. R. at 60-61. Plaintiff also shared that he lives with his sister and fiancé. R. at 74-75.

At the March 5, 2019 hearing before the ALJ, Plaintiff testified that he worked as a sanitation truck driver in 2017, but that he stopped working after a few months because of poor attendance, needing to take numerous breaks, difficulty driving, and safety issues. R. at 1513.

Plaintiff also testified that he worked as a contract truck driver in 2018 for a few months. R. at 1509-11. Plaintiff stated that he could not perform the job duties required because he had to take longer breaks than scheduled, was absent from work, and had difficulty paying attention while driving. R. at 1511-12. When asked about his income in 2016, he testified that he made $25,020 from his work as a sanitation truck driver. R. at 1514. Plaintiff received another $25,000 from a different lawsuit settlement in 2016. R. at 1515.

In the hearings, Plaintiff testified that he had been unable to work full time because of neck and back pain. R. at 69-70, 1518-19. He claimed to have problems with sitting and driving, difficulty moving his neck up and down and side to side, and numbness in his hands. R. at 70, 73-74, 1519. Plaintiff estimated that he could sit or stand for twenty to thirty minutes at a time and walk approximately one-half block at a time. R. at 1520-21. He also testified that he could not lift a gallon of milk without dropping it and had difficulty bending because of pain. R. at 1521. Plaintiff had a cane at the hearing, which he testified he used to help him walk and to get up and down. *Id*.

Plaintiff testified that on a typical day, he spends most of his time in bed, watching television and reading. R. at 74, 1525. Plaintiff stated that he steps outside as is needed, including for medical appointments. R. at 1525. Plaintiff also recounted that he accompanies his fiancé on short trips to the store. R. at 1523. His sister and fiancé do the household chores and cooking. R. at 74-75, 1523. Plaintiff noted that he stayed on the first floor of his house because of difficulty climbing stairs. R. at 76. His fiancé helps him get dressed and has to remind him to take a shower. R. at 1521, 1524. According to Plaintiff, pain medication and physical therapy give him some pain relief. R. at 72, 1518. Plaintiff also stated that he had difficulty concentrating

and following conversations. R. at 1522-24. He also falls asleep when reading and in the middle of conversations, and sometimes has to watch television programs repeatedly. R. at 1522.

### ii.      Function Report

In his function report, Plaintiff stated he has trouble turning his neck and sitting for long periods of time and that he has pain when he gets up from his seat. R. at 519. Plaintiff also reported difficulty concentrating on tasks and chronic back pain. *Id*.

### 2.  Vocational Expert's Testimony

Vocational Expert Millie Droste ("VE") testified that an individual of Plaintiff's age, education, and work history, who had the residual functional capacity to perform medium work but had the following limitations: can frequently flex, extend, and rotate his neck; can occasionally stoop, balance, kneel, crouch, or crawl; can occasionally climb ladders, ropes, scaffolds, ramps, and stairs; can occasionally push and pull and use bilateral foot controls; can frequently reach overhead bilaterally; could never perform work at unprotected heights, operate a motor vehicle, or work with vibratory tools; must avoid concentrated exposure to dust, fumes, and noxious gases; could understand, remember, and carry out simple work and adapt to routine workplace changes could not perform Plaintiff's past work. R. at 1530-31.

The VE further testified that such an individual could perform work as a hospital food service worker, a hospital cleaner, a sexton/church cleaner, and/or a change-out attendant. R. at 1531-32. However, an individual only capable of sitting for three hours and standing for two hours in an eight-hour workday, could not perform any competitive, full-time employment. R. at 1532. The VE stated that Plaintiff had no skills that were transferable to other jobs. *Id*.

**B. Medical Evidence in the Record**

    **1. Medical Treatment**

        **i.    Dr. Childebert St. Louis - Family Medicine Specialist**

On November 19, 2013, Plaintiff started treatment with Dr. Childebert St. Louis and reported neck and back pain, difficulty moving his head, and heavy snoring at night with tiredness/daytime fatigue. R. at 1096. Dr. St. Louis diagnosed Plaintiff with cervical arthritis and sleep apnea, prescribed Flexeril and Nabumetone, and referred Plaintiff for a cervical MRI and a sleep study. R. at 1097.

An MRI performed on November 22, 2013, demonstrated degenerative spondylosis at C2-C3, C3-C4, and C4-C5, but no acute disc herniation, foraminal stenosis, spinal stenosis, or cervical cord compression. R. at 1121. On December 6, 2013, Plaintiff returned for a follow-up visit and reported mild neck and foot pain. R. at 1093. A physical examination revealed a bilateral hallux valgus deformity (bunion in big toe) and decreased cervical rotation. *Id*. Plaintiff appeared well and was in no acute distress. *Id*. Dr. St. Louis diagnosed Plaintiff with a bunion of the great toe and cervical arthritis, and referred Plaintiff to a podiatrist and pain management physician for further evaluation and treatment. R. at 1093-94.

A polysomnogram study conducted on January 1, 2014, confirmed severe obstructive sleep apnea ("OSA"), with short REM latency and severe sleep disordered breathing. R. at 1111-12. Nightly use of a continuous positive airway pressure ("CPAP") machine was recommended, and Plaintiff was advised to return for a CPAP titration study. R. at 1112. A February 7, 2014 physical examination of Plaintiff revealed no changes in Plaintiff's condition, and Plaintiff was again referred for CPAP titration. R. at 1085. A May 8, 2014 physical examination of Plaintiff also revealed no changes in Plaintiff's condition. R. at 1106.

On May 3, 2014, Dr. St. Louis completed a Multiple Impairment Questionnaire opining on Plaintiff's functioning based on his diagnoses of sleep apnea and cervical arthritis. R. at 1198-1205. Dr. St. Louis noted that Plaintiff's prognosis was adequate. R. at 1198. He assessed that in an eight-hour workday, Plaintiff would be limited to sitting no more than five-to-six hours, standing and/or walking for no more than two-to-three hours, lifting no more than five pounds occasionally, and never carrying anything. R. at 1200-01. Dr. St. Louis assessed moderate limitations for grasping, turning, and twisting objects, with minimal limitations in using his fingers and hands for fine manipulations. R. at 1201-02. He noted marked limitations for reaching (including overhead), and noted that Plaintiff's limitations included no pushing, pulling, kneeling or stooping. R. at 1202, 1204. Dr. St. Louis further reported that Plaintiff's condition interfered with his ability to keep his neck in a constant position and he could not perform any work activity that would require looking at a computer screen or down at a desk. R. at 1202-03. Dr. St. Louis estimated that Plaintiff would be absent from work more than three times per month as a result of his impairments and/or treatment. R. at 1204. Dr. St. Louis shared that the symptoms and limitations detailed in the questionnaire had been present since November 19, 2013, the date Plaintiff began his treatment. *Id*.

Plaintiff was evaluated for physical therapy per Dr. Childebert's referral at Pomona Pain Management – Physical Therapy on May 14, 2014. R. at 1108. He had significant neck pain and difficulty moving his head. *Id*. A physical examination revealed decreased cervical lordosis; elevated shoulders; a shortened cervical spine; moderate spasms in the cervical spine, upper trapezius, and levator scapula; severely limited mobility of all cervical spine joints; and decreased range of motion and muscle strength in the cervical spine. *Id*. Plaintiff was prescribed physical therapy twice a week for six weeks. *Id*.

7

A May 30, 2014 lumbar MRI showed an annular disc bulge with shallow right paracentral disc herniation with mild stenosis at L4-L5, and shallow central disc herniation with mild stenosis at L5-S1. R. at 1170. A cervical MRI performed on June 4, 2014, revealed straightening of the normal cervical lordosis; large ventral/prevertebral spurs at C2-C3, C3-C4, and C4-C5; disc desiccation at C2-C3; shallow central disc herniation contacting the ventral margin of the cord at C3-C4; and disc desiccation without stenosis at C4-C5. R. at 1169.

### ii.    Dr. Madeline Cruz - Podiatrist

On January 6, 2014, Dr. Madeline Cruz saw Plaintiff for increasing left foot pain. R. at 1089-91. An examination of Plaintiff's feet revealed plantar scaling bilaterally, interdigital maceration in the third and fourth interspace bilaterally, hallux valgus bilaterally, thickened, hyperkeratotic, discolored, distal lifting nails bilaterally, redness and swelling at the medial aspect of the first metatarsal head, crepitus with range of motion of the first metatarsal phalangeal joint ("MPJ"), pain with traction of the first MPJ, and pain with direct palpation of the fibular sesamoid and the tibial sesamoid. R. at 1091. Dr. Cruz diagnosed Plaintiff with onychomycosis, dermatophytosis of foot, bursitis, and hallux valgus, and prescribed Plaintiff Lamisil and Econazole Nitrate cream. *Id*.

On January 7, 2014, X-rays of Plaintiff's left foot revealed hallux valgus with bunion formation, mild osteoarthritis of the first MPJ, and heel spurs. R. at 1120. Plaintiff returned to Dr. Cruz on June 9, 2014 for a follow-up visit, complaining of a painful left foot bunion and painful thick toenails. R. at 1102. Dr. Cruz's findings did not change significantly from Plaintiff's previous physical examination. R. at 1103. Dr. Cruz performed a debridement of mycotic nails and prescribed custom-made orthotics. *Id*. Dr. Cruz continued Plaintiff on Lamisil and Econazole Nitrate. *Id*.

### iii.   Dr. Gregory Emili - Treating Physician

On September 25, 2014, Dr. Gregory Emili evaluated Plaintiff for pain management. R. at 1162-68. Plaintiff shared that he was experiencing shoulder pain and was unable to reach above his head, could not bend and was thus unable to put on his shoes, and that he could not look up due to stiffness and pain in his neck. R. at 1162. A physical examination of Plaintiff's musculoskeletal system revealed joint stiffness, back pain, and shoulder pain, but no joint pain, muscle cramps, muscle weakness, muscle aches, or loss of strength. R. at 1164. The examination also revealed Plaintiff was well-developed, well-nourished and in no acute distress, but that Plaintiff had a markedly stiff neck and lumbar and cervical spine, rocky spasms along the entire spine, and reduced range of motion in both shoulders. R. at 1165. Dr. Emili diagnosed Plaintiff with cervical and lumbar disc displacement, brachial and lumbosacral neuritis, spasm of muscle, benign hypertension, and shoulder joint pain. R. at 1166. Plaintiff was prescribed Neurontin, Tizanidine, Ibuprofen, and Percocet. R. at 1166-67. He was also referred to physical therapy. R. at 1166.

On October 10, 2014, Plaintiff was evaluated for physical therapy per Dr. Emili's referral at Rockland Recovery Physical Therapy, PLLC. R. at 1256. Plaintiff reported symptoms of pain, stiffness, and tenderness in his neck and back, resulting in difficulty walking, standing, sitting, and looking up and down. R. at 1257. A physical examination revealed an antalgic gait; decreased cervical and lumbar range of motion; decreased strength in the cervical spine; decreased strength in the trunk; a positive straight leg raise test on the right; tenderness to palpation in the upper trapezius bilaterally; and pain to deep palpation in the quadratus lumborum bilaterally and in the right posterior superior iliac spine ("PSIS"). R. at 1257-58. Plaintiff continued to attend physical therapy through January 2015. R. at 1260-71.

At a follow-up visit with Dr. Emili on December 2, 2014, Plaintiff described significant difficulty with bending and tying his shoes and other activities of daily living because of constant back pain; significant neck pain accompanied by inability to turn his neck from side to side; numbness in his fingers; and shoulder pain with overhead reaching. R. at 1072. Dr. Emili prescribed Plaintiff Oxycodone and Amlodipine Besylate and scheduled Plaintiff for a one-month follow-up visit. R. at 1077-78.

On January 3, 2015, Plaintiff returned to Dr. Emili for a right shoulder steroid injection. R. at 1296. On March 26, 2015, Plaintiff reported ongoing neck and lower back stiffness and Dr. Emili noted Plaintiff had back and neck pain, but no joint pain or stiffness, muscle cramps/weakness, or loss of strength. R. at 1190, 1193. A physical examination revealed significant neck and musculoskeletal stiffness, and Dr. Emili continued to recommend physical therapy and refilled Plaintiff's prescriptions for Neurontin, Tizanidine, and Percocet. R. at 1194-95. At a follow-up visit on May 2, 2015, Plaintiff's condition was essentially unchanged, and a physical examination revealed stiffness in his neck and lumbar spine. R. at 1179, 1183. Dr. Emili administered a lumbar epidural steroid injection ("ESI") and continued Plaintiff on physical therapy. R. at 1184.

On May 30, 2015, Plaintiff reported that his lower back felt "very good" following the ESI, however he still had a very stiff neck and wanted another ESI. R. at 1280. A physical examination confirmed stiffness of the lumbar spine, no difficulty with concentration, normal range of motion of all joints, and normal strength in all muscle groups. R. at 1282. Dr. Emili refilled Plaintiff's Neurontin prescription and scheduled a repeat ESI for Plaintiff. *Id*. Plaintiff returned to Dr. Emili on June 6, 2015 for a lumbar ESI. R. at 1293. On June 27, 2015, Dr. Emili administered a trigger point steroid injection. R. at 1292.

In a Disability Impairment Questionnaire dated December 3, 2015, Dr. Emili reported treating Plaintiff monthly for about ten months for lumbosacral neuritis, cervical disc degeneration, brachial neuritis, and muscle spasm. R. at 1218-22. Dr. Emili opined that during an eight-hour workday, Plaintiff could sit for less than one hour, stand/walk for less than one hour, and that he must get up every thirty minutes when sitting and move around for thirty minutes to an hour. R. at 1220. Dr. Emili also opined that Plaintiff could lift/carry up to five pounds frequently and up to ten pounds occasionally. *Id*. He opined that Plaintiff could never lift or carry anything over ten pounds. *Id*. Further, Dr. Emili noted that, in his opinion, Plaintiff could never/rarely use his arms for reaching (including overhead) and that he could occasionally use his upper extremities to grasp, turn and twist objects and use his hands/fingers for fine manipulations bilaterally. R. at 1221. He opined that Plaintiff's symptoms would likely increase if he were placed in a competitive environment and Plaintiff's symptoms would frequently be severe enough to interfere with attention and concentration. *Id*. During an eight-hour workday, Dr. Emili opined that Plaintiff would need to take unscheduled breaks to rest every thirty minutes, each break lasting thirty minutes. *Id*. Finally, he stated that Plaintiff was likely to be absent from work as a result of his symptoms more than three times a month. R. at 1222.

On January 16, 2016, Plaintiff reported eighty percent improvement of his pain with treatment. R. at 1283. On February 11, 2016, Plaintiff returned to Dr. Emili describing severe neck pain that prevented him from sleeping or performing routine daily activities. R. at 1799. A physical examination revealed a very stiff neck with difficulty turning from side to side; lumbar spine stiffness; and a positive straight leg raise test. R. at 1803. Plaintiff otherwise had no back pain, joint pain or stiffness, muscle cramps, weakness, or aches or loss of strength. R. at 1802. Dr. Emili performed a left-sided L4-L5 fluoroscopic ESI. R. at 1807. Plaintiff was also

prescribed Percocet, to be taken as needed, and instructed to schedule a follow-up visit in a month. *Id*.

On March 8, 2016, Plaintiff reported that he was suffering from neck and back pain, but that his neck pain was worse than his back pain. R. at 1810. A physical examination revealed improved lumbar spine tenderness. R. at 1814. Dr. Emili scheduled a repeat cervical ESI. R. at 1815. There were no significant changes in Plaintiff's symptoms or physical examination at his follow-up visits on April 7 and April 9, 2016, though Dr. Emili noted improved stiffness in the neck. R. at 1817, 1821, 1826, 1830. Plaintiff rated his pain as tolerable. R. at 1817. At these visits, Dr. Emili refilled Plaintiff's Percocet prescription and performed a fluoroscopic cervical ESI at C4-C5 and C6-C7. R. at 1824, 1833-34.

On May 5, 2016, Plaintiff reported significant improvement of his pain with treatment. R. at 1843. A physical examination revealed lower back tenderness. R. at 1848. In a return visit on June 18, 2016, Plaintiff requested a lumbar ESI to help with his lower back pain. R. at 1863. Plaintiff reported recurrent lower back pain, and pain and stiffness in his neck with difficulty turning from side to side. *Id*. A physical examination revealed stiffness and tenderness in his neck and a positive straight leg raise test. R. at 1867. Dr. Emili performed a fluoroscopic L5-S1 ESI. R. at 1871.

In a letter dated June 25, 2016, Dr. Emili opined that in an eight-hour workday, Plaintiff would be limited to sitting less than one hour and standing and/or walking less than one hour. R. at 1349. He opined that Plaintiff could lift and carry up to ten pounds occasionally and that he would have significant limitations in reaching, handling, and using his fingers. *Id*. Additionally, it was his opinion that Plaintiff could never/rarely reach in any direction with either arm, and that he was limited to only occasionally performing fine and gross

manipulations. *Id*. He noted that Plaintiff's pain and fatigue were severe enough to frequently interfere with his attention and concentration throughout the workday, and that he would need to take unscheduled breaks to rest every thirty minutes with each break lasting thirty minutes. *Id*.

On July 2, 2016, Plaintiff reported pain in his neck, lower back, and right shoulder. R. at 1874. Plaintiff rated his back pain six out of ten, and his shoulder and neck pain eight out of ten. *Id*. He had gone to physical therapy that morning, which he thought was "very effective." *Id*. A physical examination revealed a very stiff neck and a positive straight leg raise test. R. at 1878-79. Dr. Emili prescribed Plaintiff Percocet, Tizanidine, Amlodipine Besylate, Ibuprofen, and Oxycodone. R. at 1882. There was no significant change in Plaintiff's chronic pain at a follow-up visit on July 30, 2016. R. at 1884. A physical examination revealed stiffness and reduced range of motion in Plaintiff's neck and a positive straight leg raise test. R. at 1888. Dr. Emili refilled Plaintiff's Oxycodone, Amlodipine Besylate, and Tizanidine prescriptions. R. at 1892.

There was no significant change in Plaintiff's condition at a follow-up visit on September 1, 2016, and Plaintiff reiterated that physical therapy was "very effective." R. at 1894. Plaintiff returned to Dr. Emili on October 1, 2016, with symptoms of throbbing and aching pain in his neck and lower back, along with radiating pain/ tingling in his legs. R. at 1904. His neck pain was aggravated by looking side to side, trying to fully extend his neck to look up, while his lower back pain was aggravated by prolonged sitting or rising from an upright position. *Id*. A physical examination revealed a reduced range of motion in Plaintiff's still stiff neck, a positive straight leg raise test, mild to moderate pain elicited in the L4-L5 and the neck, and a positive Spurling test with moderate pain and severe stiffness with flexion and rotation. R. at 1908-09. Dr. Emili

refilled Plaintiff's Oxycodone and Ibuprofen prescriptions, and started him on Lorzone and Lidocaine. R. at 1912.

On November 5, 2016, Plaintiff reported that his pain had worsened and that he had used cocaine, which was not helpful and did not control his pain. R. at 1915. He rated his neck and lower back pain as moderate. *Id*. A physical examination revealed stiffness of the paravertebral muscles, as well as stiffness and tenderness of the lumbar spine. R. at 1920. Dr. Emili performed a fluoroscopically guided ESI at L5-S1, and refilled Plaintiff's Oxycodone prescription. R. at 1923-24. Plaintiff's condition remained unchanged on December 3, 2016. R. at 1927, 1931-32. Dr. Emili refilled Plaintiff's Oxycodone and Amlodipine Besylate prescriptions. R. at 1933.

On January 7, 2017, Plaintiff stated that he had approximately two weeks of pain relief following the previous ESI, but that his pain was exacerbated by prolonged weight bearing, sitting, and bending. R. at 1935. Dr. Emili refilled Plaintiff's Oxycodone prescription and started him on Benzonatate. R. at 1939. An examination revealed normal strength in all muscle groups, normal range of motion of all joints, no joint effusions, no muscle masses, and no clubbing, cyanosis, or edema. R. at 1938. Dr. Emili's physical examination findings remained substantially unchanged at a follow-up visit on February 3, 2017. R. at 1941, 1945-46.

At a visit on March 2, 2017, Plaintiff reported increased pain and stiffness in the cervical region. R. at 1956. A physical examination revealed significant stiffness in the paravertebral area and tenderness in his neck, but improved lumbar spine tenderness and spasms. R. at 1960-61. Dr. Emili administered a cervical ESI and continued Plaintiff on Oxycodone. R. at 1961, 1963. On March 30, 2017, Plaintiff returned to Dr. Emili with symptoms of lower back pain and pain and stiffness in his neck with difficulty turning it from side to side. R. at 1964. Dr. Emili's physical examination findings remained substantially the same from Plaintiff's prior visit. R. at 1969. Dr.

Emili performed another fluoroscopic ESI at L5-S1 and continued Plaintiff on Oxycodone. R. at 1970.

On May 4, 2017, Plaintiff reported neck pain that radiated to the right arm resulting from a slip and fall, which was aggravated by physical activity and looking up. R. at 1973. Plaintiff also reported that the cervical ESI helped with his neck pain, which relieved the pain about fifty percent. *Id.* Plaintiff further reported that his back condition had been improving since his last visit and that his pain was significantly better since then. *Id.* Plaintiff's physical examination revealed normal neck findings, normal strength in all muscle groups, normal range of motion of all joints, no joint effusions, no muscle masses, no clubbing, cyanosis, or edema. R. at 1978.

On June 1, 2017, Plaintiff reported that the previous ESI gave him some temporary pain relief. R. at 1981. Plaintiff also shared that his pain was exacerbated by weight bearing, sitting, and bending, and that he could hardly look up. *Id.* He mentioned that he was considering surgery on his neck since he did not find the cervical ESIs as effective as the lumbar ESIs. *Id.* A physical examination revealed decreased range of motion with flexion and significant stiffness in Plaintiff's neck as well as lower back pain. R. at 1986. Dr. Emili refilled Plaintiff's prescriptions for Oxycodone and Ibuprofen. R. at 1987.

On July 6, 2017, Plaintiff reported continued stiffness and pain in his neck, and rated his discomfort as moderate. R. at 1989. A physical examination revealed stiffness in his neck but improvement in his back. R. at 1994. At a follow-up visit on July 13, 2017, there was no significant change in Plaintiff's symptoms or in Dr. Emili's findings. R. at 1997, 2002. Plaintiff returned to Dr. Emili on August 1, 2017 for a neck injection, noting that the last injection was "very effective and lasted a long time" and that he currently had no pain. R. at 2005. Dr. Emili's physical examination of Plaintiff revealed a normal neck and cervical spine tenderness. R. at

15

2010. Dr. Emili performed a fluoroscopic cervical ESI at C5-C6 and C6-C7. R. at 2012. Dr.

Emili prescribed Plaintiff Cyclobenzaprine, Lisinopril-Hydrochlorothiazide and Ibuprofen. R. at

2011. On August 15, 2017, Plaintiff reported improvement of his neck pain following the

cervical ESI and noted that he felt stable. R. at 2014. A physical examination revealed tenderness

and decreased range of motion in his neck. R. at 2019. Dr. Emili refilled Plaintiff's Oxycodone

prescription. R. at 2020.

On September 12, 2017, Plaintiff described worsening pain with cramping and spasms.

R. at 2022. A physical examination revealed neck stiffness and muscle spasms. R. at 2027. Dr.

Emili performed a fluoroscopic ESI at L5-S1. R. at 2029. On October 13, 2017, Plaintiff

reported throbbing and aching neck pain aggravated by bending and turning his neck, and

indicated that he had obtained some relief with physical therapy and ESI. R. at 2050. A physical

examination revealed neck pain with flexion and extension and paravertebral tenderness with

palpation, but also normal strength in all muscle groups. R. at 2055. Dr. Emili refilled Plaintiff's

Oxycodone prescription. R. at 2058. Plaintiff returned to Dr. Emili on November 14, 2017, and

reported symptoms of neck pain and stiffness as well as lower back pain that radiated to his hips

bilaterally. R. at 2060. Plaintiff noted that his lower back pain was aggravated by prolonged

sitting or standing and that ESI resulted in a twenty percent reduction in pain. *Id*. A physical

examination revealed neck pain with flexion/extension and back pain with lumbar spine

palpation, but normal strength in all muscle groups, normal range of motion of all joints, no joint

effusions, no muscle masses, and no clubbing, cyanosis, or edema. R. at 2065.

On November 30, 2017, Plaintiff reported that the injections he received were "very

effective," and he requested a repeat injection. R. at 2068. Dr. Emili's findings remained

substantially unchanged from the previous visit. R. at 2073. Dr. Emili performed a cervical ESI at C4-C5 and C6-C7. R. at 2074.

At a follow-up visit on December 19, 2017, a physical examination revealed neck tenderness with palpation, but normal strength in all muscle groups, normal range of motion of all joints, no joint effusions, no muscle masses, and no clubbing, cyanosis or edema. R. at 2077, 2082. Plaintiff was prescribed Lidocaine-Prilocaine cream and Ibuprofen. R. at 2083. On January 11, 2018, Plaintiff reported worsening neck pain and asked for opioid medication though the pain responded well to the last ESI. R. at 2085. Dr. Emili noted that they recently weaned him off opioids and referred him to rehab because he was not doing well with them. *Id*. They also discussed the possibility of starting him on Suboxone to deal with the issue of addiction. *Id*. A physical examination revealed cervical spine stiffness. R. at 2090. Dr. Emili prescribed Plaintiff Amlodipine Besylate, Neurontin, and Cyclobenzaprine. R. at 2098-99. Dr. Emili started Plaintiff on Suboxone on January 16, 2018. R. at 2101, 2109. About a week later, Plaintiff reported losing consciousness after taking Suboxone, and that he was still having neck and lower back pain. R. at 2112. He also reported that he had not used cocaine for about four months. *Id*. A physical examination revealed cervical spine stiffness. R. at 2117.

On January 30, 2018, Plaintiff stated that he still had a lot of neck and lower back pain, and that he obtained no relief on Suboxone and wanted to be placed back on pain management. R. at 2125. Dr. Emili's findings from Plaintiff's previous evaluation remained substantially unchanged. R. at 2130-31. Dr. Emili re-started Plaintiff on Percocet and refilled Plaintiff's Amlodipine Besylate, Neurontin, and Ibuprofen prescriptions. R. at 2132. Plaintiff returned to Dr. Emili on March 1, 2018. R. at 2134-42. A physical examination revealed neck stiffness with reduced range of motion and mild lumbar spine tenderness. R. at 2139-40. Dr. Emili refilled

Plaintiff's Percocet, Lisinopril-Hydrochlorothiazide, Neurontin, and Cyclobenzaprine prescriptions. R. at 2141.

Dr. Emili requested an MRI of Plaintiff's lumbar spine which was conducted on March 12, 2018 and demonstrated the following: degenerative disc changes at L4-L5 and L5-S1 with slight anterolisthesis of L4 on L5 and retrolisthesis of L5 on S1; anterior osteophytes from L2 through S1; lateral osteophytes slightly displacing the exiting nerve root in the lateral foramina at L1-L2; a mild disc bulge and facet arthropathy with mild narrowing of the central canal and mild bilateral foraminal narrowing at L2-L3; a mild disc bulge and facet arthropathy, and mild central canal and foraminal narrowing at L3-L4; a broad disc bulge, facet arthropathy, a very small right paracentral protrusion, and mild to moderate foraminal narrowing bilaterally at L4-L5; facet arthropathy with mild to moderate foraminal narrowing bilaterally, bilateral lateral osteophytes that slightly laterally displace the exited L5 roots, and a central annular fissure at L5-S1; and findings consistent with diffuse idiopathic skeletal hyperostosis ("DISH") or other spondyloarthropathy. R. at 2250. An MRI of the cervical spine conducted that same day demonstrated straightening of the cervical spine, with bulky anterior osteophytes that bridged from C2 through T2, consistent with DISH. R. at 2252.

Plaintiff received additional ESIs on April 17, 2018, May 3, 2018 and August 30, 2018. R. at 2164-65, 2175-76, 2239. An examination on May 31, 2018 revealed normal strength in all muscle groups and normal range of motion in all joints, but restricted extension and lateral rotation of the neck. R. at 2198.

On June 28, 2018, Plaintiff reported that he had a surgical consultation for a possible neck surgery, but that he was declined. R. at 2201. He indicated that he would have to manage his pain by continuing to go to physical therapy, taking medication and receiving injections. *Id*.

Plaintiff reported that he was working full-time as a driver. *Id*. Upon physical examination, Plaintiff had a negative straight leg raise test. R. at 2207. Physical examinations performed by Dr. Emili from July 5, 2018 through August 30, 2018, revealed largely similar findings to previous visits. R. at 2217 (very stiff neck with reduced range of motion and stiffness of the lumbar spine); R. at 2227 (cervical spine pain with flexion and extension and mild lumbar spine stiffness); R. at 2236 (very tender and stiff cervical and lumbar spine). At a follow-up appointment on July 31, 2018, Dr. Emili noted that Plaintiff's neck and back pain had been responding to medication and physical therapy and that he was progressing well. R. at 2222.

In a letter dated October 30, 2018, Dr. Emili reported treating Plaintiff since September 2014, for pain in his neck, lower back, and both shoulders. R. at 2253. Dr. Emili reported that Plaintiff was unable to look up or sideways without almost turning his whole body because of severe cervical stiffness, and that he could not bend because of DISH syndrome. *Id*.

### 2.  Opinion Evidence

#### i.  Dr. Nader M. Daryaee - Consultative Family Physician

On July 12, 2013, Dr. Nader M. Daryaee performed an internal medicine consultative examination in connection with Plaintiff's disability claims. R. at 790-98. Plaintiff complained of neck and lower back pain for the past year; however, Plaintiff denied weakness and numbness in his neck and weakness in his back, though he reported numbness in his back. R. at 790. Dr. Daryaee noted that Plaintiff did his own grocery shopping, cooking, cleaning, laundry, and gardening. *Id*. Plaintiff was in no acute distress, appeared to be well-developed, well-nourished, normal, alert and well-hydrated. R. at 792. A musculoskeletal examination revealed no swelling or deformity in his joints, no scoliosis or kyphosis in his thoracic spine, and no evidence of trigger points. R. at 793. Plaintiff had full grip strength and no neurological deficits. *Id*. Plaintiff

had a normal gait, could walk on his heels and toes and squat, used no assistive devices, needed

no help changing for the examination, was able to rise from his chair using the table for support,

and his straight leg raise in supine and sitting positions were within normal range. *Id*. Dr.

Daryaee diagnosed Plaintiff with cervical and lumbar spine pain and sleep apnea based on

Plaintiff's medical history. *Id*. A cervical spine X-ray revealed findings consistent with diffuse

idiopathic skeletal hyperostosis (DISH). R. at 798.

### ii.    Dr. Nicolas Bancks - State Agency Physician

On August 30, 2013, Dr. Nicolas Bancks performed a Residual Functional Capacity

assessment and opined that Plaintiff could perform past relevant work as a driver with some

postural limitations. R. at 129-33. Dr. Bancks assessed that Plaintiff could lift and/or carry fifty

pounds occasionally and twenty-five pounds frequently, and stand/walk/sit about six hours in an

eight-hour workday. R. at 129-30. He opined that Plaintiff could frequently crouch and crawl

and had no limitations in pushing or pulling, handling, using his fingers, feeling, climbing ramps

and stairs, climbing ladders, ropes and scaffolds, balancing, stooping and kneeling. R. at 130. Dr.

Bancks determined that Plaintiff was limited in his ability to reach overhead due to Plaintiff's

DISH, pain, and mild range of motion on extension. R. at 130-31. Dr. Bancks further opined that

Plaintiff should avoid concentrated exposure to hazards (machinery, heights, etc.), but that he

could otherwise be exposed to extreme cold and heat, wetness, humidity, noise, vibration, fumes,

odors, dusts, gases and poor ventilation. R. at 131.

### iii.    Dr. Julia Kaci - SSA Consultative Examiner

On December 9, 2014, Plaintiff saw Dr. Julia Kaci for an orthopedic examination in

connection with his disability claims. R. at 1063-65. Dr. Kaci observed that Plaintiff had a

guarded, but otherwise normal gait and normal station and could walk on his heels and toes

without difficulty, used no assistive device and could squat halfway down. R. at 1064. Dr. Kaci noted that Plaintiff needed no help changing for the examination or getting on and off the examination table, and was able to rise from his chair without difficulty. *Id*. Plaintiff had five-out-of-five grip-strength bilaterally and his hand/finger dexterity was intact. *Id*. Dr. Kaci noted a decreased range of motion in the cervical and lumbar spine, paraspinal tenderness on the lumbar spine level and bilateral sacroiliac joint tenderness. R. at 1064-65. Plaintiff had no cervical or paracervical pain or spasm and no trigger points and his straight leg test was negative on both legs. *Id*. Plaintiff had full range of motion in his upper and lower extremities as well as full muscle strength and no sensory abnormalities. *Id*. Dr. Kaci diagnosed Plaintiff with chronic neck pain and low back pain with history of disc herniation and radiculopathy. R. at 1065.

Dr. Kaci opined that Plaintiff had marked limitations in activities requiring frequent neck turns, moderate limitations in squatting, kneeling, lifting, and carrying, and mild limitations in bending, walking, and standing. *Id*. Dr. Kaci also completed a medical source statement of ability to do work-related activities opining that in an eight-hour workday, Plaintiff could continuously lift/carry up to twenty pounds, and frequently lift/carry up to fifty pounds. R. at 1066. Plaintiff could sit for two hours at one time and four hours total, stand one hour at a time and two hours total, and walk thirty minutes at one time and two hours total. R. at 1067. Dr. Kaci noted that Plaintiff could continuously reach in all directions, and handle, finger, and feel with both arms/hands and occasionally push/pull with the upper extremities. R. at 1068. He could also frequently operate foot controls and climb stairs and ramps, but could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. R. at 1068-69. Plaintiff could occasionally tolerate exposure to unprotected heights and moving mechanical parts and could frequently operate a motor vehicle, and be exposed to humidity and wetness, dust, odors, fumes and

pulmonary irritants, extreme cold and heat, and vibrations. R. at 1070. Dr. Kaci further opined that Plaintiff could still travel without a companion, ambulate without an assistive device, walk a block at a reasonable pace, use public transportation, climb a few steps at a reasonable pace, prepare simple meals and feed himself, care for his personal hygiene, and sort handle, or use paper/files. R. at 1071.

On September 10, 2018, Dr. Kaci evaluated Plaintiff again. R. at 1788-91. A physical examination revealed the following: a slow gait; squat limited to one-third of full; decreased range of motion in flexion and extension, lateral flexion bilaterally, and bilateral rotation in the cervical spine; tenderness with palpation at levels C4, C5, C6, and C7; paracervical pain, but no spasms at those same levels; decreased muscle strength proximally in the upper extremities measured at 4+ out of 5; decreased range of motion in flexion and extension of the thoracic and lumbar spines; and tenderness to palpation of the entire lumbar spine. R. at 1789-90. Dr. Kaci noted that Plaintiff did not use an assistive device, needed no help changing for the examination or getting on and off the examination table, and was able to rise from his chair without difficulty. R. at 1789. Plaintiff also had full grip-strength and intact hand and finger dexterity. R. at 1790. Plaintiff had a full range of motion in all of his upper and lower extremities. *Id*. He had no trigger points in his cervical or thoracic and lumbar spines and his straight leg raise test was negative. *Id*. Dr. Kaci diagnosed Plaintiff with chronic neck pain, chronic lower back pain, OSA on CPAP, insomnia, hypertension, prediabetes, and arrhythmia. *Id*.

After this visit, Dr. Kaci opined that Plaintiff had moderate limitations in heavy lifting, carrying, pushing, pulling, and activities requiring frequent neck turns, bending, kneeling, and squatting and noted that Plaintiff should avoid driving and operating machinery. R. at 1791. In a medical source statement of ability to do work-related activities completed on September 14,

2018, Dr. Kaci further opined that in an eight-hour workday, Plaintiff could lift up to ten pounds continuously, up to twenty pounds frequently, and up to fifty pounds occasionally, and that Plaintiff could carry up to twenty pounds occasionally, up to fifty pounds frequently, and up to a hundred pounds occasionally. R. at 1792. She noted that Plaintiff could sit for four hours at one time and eight hours total, stand for four hours at one time and six hours total, and walk for thirty minutes at one time and two hours total. R. at 1793. Dr. Kaci further noted that Plaintiff could push and pull occasionally, frequently operate foot controls, but that he could never climb ramps and stairs, ladders or scaffolds, or balance, stoop, kneel, crouch or crawl. R. at 1794-95. She assessed that he was able to occasionally operate a motor vehicle and occasionally tolerate exposure to vibrations and moving mechanical parts. R. at 1796. Dr. Kaci opined that Plaintiff could also continuously reach in all directions, handle, finger, and feel with both hands, and that Plaintiff could frequently be exposed to unprotected heights, humidity and wetness, dust, odors, fumes, and pulmonary irritants, and extreme cold and heat. 1794, 1796.

### iv.    Dr. Joseph F. DeFeo - Examining Orthopedist

On July 26, 2016, Dr. Joseph F. DeFeo conducted an orthopedic evaluation of Plaintiff. R. at 1356. A physical examination revealed the following: a mildly antalgic gait; decreased range of motion of cervical spine in flexion, rotation, and tilt; decreased muscle strength measured at 4+ out of 5+ in the biceps and deltoids bilaterally, hand intrinsic muscles with regard to pinching and opposition, as well as wrist flexors; limited range of motion in both shoulders with external and internal rotation; pain on palpation over the trapezius muscles and both acromioclavicular joints; decreased range of motion in the lumbosacral spine in flexion, extension, and bilateral rotation; pain on palpation and percussion over the L4-L5 and L5-S1 vertebral bodies and both sacroiliac joints; decreased strength in the hip flexors and quadriceps

measured at 4+ out of 5+ bilaterally, and positive straight leg raise tests to 80 degrees seated and

60 degrees in a supine position, bilaterally. R. at 1357-58. Dr. DeFeo diagnosed Plaintiff with

multilevel spondylosis of the cervical and lumbosacral spine with secondary radiculopathy and

motor weakness, and multiple herniated discs with foraminal stenosis at C3-C4, L4-L5, and L5-

S1. R. at 1358. He also noted that Plaintiff had significant loss of range of motion of his cervical

spine resulting in spasms at the extremes of motion and that he had degenerative joint disease in

both shoulders which resulted in a marked decrease in range of motion as well as motor strength

of both shoulders. *Id*. According to Dr. DeFeo, the secondary radiculopathy of the cervical spine

further decreased Plaintiff's hand intrinsic muscle strength especially with regard to pinch and

opposition. *Id*. It was Dr. DeFeo's opinion that Plaintiff was totally disabled. *Id*.

 In a Disability Impairment Questionnaire completed on the same day, Dr. DeFeo opined

that in an eight-hour workday, Plaintiff could sit for three hours, and stand/walk for two hours.

R. at 1351-55. According to Dr. DeFeo, Plaintiff needed to get up hourly when sitting and move

around for five-to-ten minutes, before returning to a seated position. R. at 1353. Dr. DeFeo noted

that Plaintiff could lift/carry up to five pounds occasionally but could never/rarely use his arms

for reaching. R. at 1353-54. He could occasionally use his upper extremities to grasp, turn, and

twist objects, and could use his hands/ fingers for fine manipulations, bilaterally. R. at 1354. Dr.

DeFeo responded to the ALJ's August 16, 2016 request for clarification regarding his earlier

reports, explaining, among other things, his expertise and training, the medical records and

evidence relied upon in fashioning his opinions, and his fee for providing the reports. R. at

1406-09.

 Dr. DeFeo performed a second evaluation of Plaintiff on February 15, 2019. R. at

2274. Dr. DeFeo observed that Plaintiff was well-developed and that he entered the office

without the use of a cane or any other support, but that he needed his fiancé's assistance to get ready for the examination. R. at 2275. A physical examination revealed a mildly antalgic gait and an inability to perform heel-toe walking in tandem. *Id*. Plaintiff's cervical spine range of motion was limited and there was evidence of paracervical muscle spasm noted especially on rotation. R. at 2276. Plaintiff had decreased muscle strength in his upper extremities, limited range of motion and muscle atrophy in his shoulders and arms, decreased lumbar range of motion, decreased hip flexor and quadricep femoris strength, positive bilateral straight leg raise tests in supine position, and decreased circumference of the right thigh. *Id*. Dr. DeFeo diagnosed Plaintiff with multilevel cervical and lumbosacral spondylosis with herniated discs at C3-C4, L4-L5, and L5-S1, secondary radiculopathy and myelopathy of the upper and lower extremities, and post-traumatic arthrosis of the left shoulder joint, which appeared to include chronic rotator cuff tendonitis and possible impingement syndrome. R. at 2277-78. Dr. DeFeo noted Plaintiff's symptoms had not responded to extensive conservative care and he opined that Plaintiff was totally disabled. R. at 2277.

In a Lumbar Spine Impairment Questionnaire dated March 5, 2019, Dr. DeFeo opined that in an eight-hour workday, Plaintiff could sit for two hours and stand/walk for two hours. R. at 2268. Dr. DeFeo indicated that Plaintiff must get up hourly when sitting and move around for five-to-ten minutes before returning to a seated position. R. at 2269. He noted that Plaintiff could occasionally lift/carry up to five pounds. *Id*.

## LEGAL STANDARD

### A.  Judicial Review of the Commissioner's Determination

A district court reviews a Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence supporting the Commissioner's

decision and whether the Commissioner applied the correct legal standard. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

The substantial evidence standard means that once an ALJ finds facts, a district court can reject those facts "only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (internal quotation marks omitted). In other words, this Court must afford the Commissioner's determination considerable deference, and may not "substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted).

## B. Commissioner's Determination of Disability

### 1. Definition of Disability

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Further, "[t]he impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

## 2.   The Commissioner's Five-Step Analysis of Disability Claims

The Commissioner uses a five-step process to determine whether a claimant has a disability within the meaning of the Social Security Act. 20 C.F.R. § 404.1520(a)(4). First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. *Id*. § 404.1520(a)(4)(i). If so, the Commissioner will consider the claimant not to be disabled. *Id*. Second, if the claimant is not engaged in substantial gainful activity, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that meets the duration requirement of a continuous period of 12 months. *Id*. § 404.1520(a)(4)(ii); *see also id*. § 404.1509 (establishing duration requirement). Third, if the claimant suffers from such an impairment, the Commissioner determines whether that impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of the Social Security Act regulations. *Id*. § 404.1520(a)(4)(iii); *see also id*. § Pt. 404, Subpt. P, App'x 1. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's impairment, he has the residual functional capacity ("RFC") to perform his past work. *Id*. § 404.1520(a)(4)(iv). Finally, if the claimant is unable to perform his past work, the Commissioner determines whether there is other work which the claimant could perform. *Id*. § 404.1520(a)(4)(v).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and 'bears the burden of proving his or her case at steps one through four.' *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). At step five, however, "the burden shifts to the Commissioner to show that there [are] a significant number of jobs in the national economy that [the claimant] could perform based on his residual functional capacity, age, education, and prior vocational experience." *Butts v. Barnhart*, 388 F.3d 377, 381

(2d Cir. 2004) (citing 20 C.F.R. § 404.1560), *amended on reh'g*, 416 F.3d 101 (2d Cir. 2005);

*see also* 20 C.F.R. § 404.1520(a)(4)(v).

### 3. The ALJ's Decision

First, the ALJ concluded that there were periods of time during which Plaintiff had not

engaged in substantial gainful activity since February 5, 2013, the alleged onset date. R. at

1423-24.[2]

Second, the ALJ concluded that Plaintiff had the following severe impairments:

chronic obstructive pulmonary disorder ("COPD"), sleep apnea, hypertension, degenerative disc

disease of the cervical and lumbar spine, obesity, and diffuse idiopathic hyperostosis (DISH)

syndrome. R. at 1424.

Third, the ALJ determined that Plaintiff did not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, App'x 1. R. at 1426.

Fourth, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to

perform medium work as defined in 20 C.F.R. 404.1567(c) and 416.967(c) except that Plaintiff

can frequently flex, extend, and rotate his neck and can occasionally stoop, balance, kneel,

crouch and crawl. R. at 1427. The ALJ determined that Plaintiff can occasionally climb ladders,

ropes, scaffolds, ramps and stairs and can occasionally push and pull. *Id*. Additionally, the ALJ

determined Plaintiff can occasionally use bilateral foot controls, can frequently reach overhead

bilaterally, and can understand, remember and carry out simple work and adapt to routine

workplace changes. *Id*. However, the ALJ also determined that Plaintiff cannot work at

---

[2] According to the ALJ, there was evidence in the record showing that Plaintiff had worked since the alleged onset date and that he had engaged in substantial gainful activity. R. at 1424. However, the ALJ proceeded to the next step of the analysis "since there have been periods since the alleged onset date in which the claimant did not perform substantial gainful activity." *Id.*

unprotected heights, operate a motor vehicle, work with vibratory tools and that he must avoid concentrated exposure to dust, fumes and noxious gases. *Id*.

Fifth, the ALJ determined that Plaintiff is unable to perform past relevant work as a sanitation driver. R. at 1435.

Sixth, having considered Plaintiff's age, education, work experience and residual functional capacity, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. R. at 1436. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Act. R. at 1437.

## DISCUSSION

Plaintiff asserts that the ALJ's determination that he is not disabled is erroneous. Plaintiff makes two main arguments in support of this contention: 1) the ALJ failed to properly weigh the medical opinion evidence, and 2) the ALJ failed to properly evaluate Plaintiff's subjective statements. The Court holds that the ALJ's decision was supported by substantial evidence and was not erroneous.

### I.      The ALJ's RFC Determination is Supported by Substantial Evidence

A plaintiff's residual functional capacity ("RFC") "is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a). The ALJ "[is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). The ALJ determined that Plaintiff was unable to perform any past relevant work, but that he had the RFC to perform medium work with some limitations. R. at 1427-35. After evaluating all the evidence in the record, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform such as a

29

hospital food service worker/cleaner, sexton, and change house attendant. R. at 1436. The Court

holds that the ALJ's RFC determination is supported by substantial evidence and that contrary to

Plaintiff's assertions, the ALJ properly weighed the medical opinion evidence and Plaintiff's

subjective statements.

### A.  The ALJ Properly Weighed the Medical Opinions in the Record

#### 1.  Treating Physicians' Opinions

Plaintiff argues that the ALJ violated the treating physician rule by giving little weight to

the opinions from his treating physicians, Dr. St. Louis and Dr. Emili. Pl. Mot. at 24. According

to Plaintiff, the ALJ mischaracterized the record when he concluded that the clinical and

objective evidence did not support the opinions of Dr. St. Louis and Dr. Emili since they had

based their opinions on MRIs and other clinical findings. *Id*. at 24-25. He asserts that the MRIs

document "significant abnormalities throughout the cervical and lumbar spine" and that these

findings are "clinically correlated by examinations in treatment records that document," *inter*

*alia*, Plaintiff's stiff neck, stiffness in the lumbar and cervical spine, spasms along the spine,

reduced range of motion and strength in certain areas, and positive straight leg raise tests. *Id*. at

25. Further, Plaintiff asserts that it was error for the ALJ to discount Dr. St. Louis's and Dr.

Emili's opinions due to Plaintiff's "response to treatment" because "[t]here [was] no evidence

that Plaintiff had significant and sustained improvement." *Id*. at 26. Plaintiff also argues that

Plaintiff's ability to perform some "minimal work and other activities" also fails to contradict Dr.

St. Louis's and Dr. Emili's opinions. *Id*. The Court disagrees.

Under the treating physician rule, the opinion of a plaintiff's treating physician is

afforded "controlling weight so long as it is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the

case record." *Burgess*, 537 F.3d at 128 (internal citations and quotation marks omitted).

"Generally, the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts, for genuine conflicts in the medical evidence are for the Commissioner to resolve." *Id*. (internal citations and quotation marks omitted). Ultimately, an ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Crowell v. Comm'r of Soc. Sec. Admin.*, 705 F. App'x 34, 35 (2d. Cir. 2017) (summary order) (quoting *Burgess*, 537 F.3d at 128) (internal quotation marks omitted). Under *Burgess*, the ALJ must (1) decide whether a treating physician's medical opinion merits "controlling weight," and if it does not, then "determine how much weight, if any, to give it" based on certain factors such as length of treatment and type of healthcare provider. *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019).

Reviewing the ALJ's decision, the Court concludes that the ALJ did not err by declining to assign controlling weight to Dr. Emili's opinion. The ALJ explained that Dr. Emili's opinion was not entitled to controlling weight because it was "inconsistent with other medical opinions and [Plaintiff's] work activity after [the] onset date, and generally poorly supported by his treatment records throughout the years showing improvement with treatment." R. at 1431. The ALJ rested his decision on the fact that while Dr. Emili noted stiffness of the neck, lumbar spine, and shoulders as well as muscle spasms, throughout Dr. Emili's treatment notes there was no spinal tenderness or neurological deficits noted and Plaintiff's motor strength was five-out-of-five in all four extremities. *Id*. Further, the ALJ stated that Dr. Emili's treatment records also did not show significant neurological deficits or muscle weakness/ diminished muscle strength. *Id*. The ALJ also found that Dr. Emili's opinions were inconsistent with the nature of the treatment

that Plaintiff received and the fact that Plaintiff was able to resume his prior employment for a period of time after the alleged onset date and perform other work activity. R. at 1431-32. Not only was Dr. Emili's opinion inconsistent with his own evaluations of Plaintiff, it was also inconsistent with the opinions of the consultative physicians as discussed below. Dr. Emili's opinion was thus accorded little weight. *Id*. at 1431.

The ALJ's decision to assign Dr. Emili's opinion little weight was supported by substantial evidence. *See* R. at 1165 (normal neck findings and no spinal tenderness); R. at 1194 (stiff neck but no spinal tenderness); R. at 1282 (stiffness in lumbar spine but normal strength in all muscle groups, normal range of motion of all joints, no joint effusions, no muscle masses, no clubbing, cyanosis or edema) ; R. at 1283 (Plaintiff reported eighty percent improvement of his pain); R. at 1817, 1821, 1830 (improved stiffness in the neck; Plaintiff rated pain as "tolerable"); R. at 1843 (reporting significant improvement of his pain with treatment); R. at 1938 (noting normal strength in all muscle groups, normal range of motion of all joints, no joint effusions, no muscle masses, and no clubbing, cyanosis, or edema); R. at 1961 (noting improved lumbar spine tenderness and spasms); R. at 1973 (reporting that the cervical ESI relieved his neck pain about fifty percent and that his back condition had been improving since his last visit); R. at 1978 (noting normal neck findings, normal strength in all muscle groups, normal range of motion of all joints, no joint effusions, no muscle masses, and no clubbing, cyanosis or edema); R. at 1994 (noting improvement in Plaintiff's back); R. at 2005 (reporting that the ESI was "very effective" and "lasted a long time" and that he had no pain); R. at 2014 (reporting improvement of his neck pain after ESI and that he felt stable); R. at 2065 (noting normal strength in all muscle groups, normal range of motion of all joints, no joint effusions, no muscle masses, and no clubbing, cyanosis or edema); R. at 2198 (similar); R. at 2201 (reporting that he was working full-time as

driver); R. 2222 (noting that Plaintiff's neck and back pain were responding to medication and physical therapy and that Plaintiff was progressing well).

The Court also concludes that the ALJ did not err by declining to assign controlling weight to Dr. St. Louis's May 2014 opinion regarding Plaintiff's RFC. The ALJ found the opinion poorly supported and gave it little weight. R. at 1433. The ALJ discounted Dr. St. Louis's observations regarding Plaintiff's postural limitations because his treatment records noted no neurological deficits and instead noted that Plaintiff had a normal gait. R. at 1433. Further, there was no evidence of disc herniation in the MRI conducted several months prior. *Id,* Lastly, the ALJ found that Dr. St. Louis's opinion was inconsistent with Dr. Emili's physical examination findings and improvement with treatment discussed above. *Id*. This decision is supported by substantial evidence. *See supra* pp. 31-33.

Contrary to Plaintiff's assertions, Plaintiff's ability to return to work and improvement with treatment were properly considered by the ALJ when determining that he was not disabled. Plaintiff's ability to return to work as a full-time driver is significant in evaluating his claim of disability. *See Reynolds v. Colvin*, 570 F. App'x 45, 47 (2d Cir. 2014) (summary order) (finding it difficult to infer severe impairment from earlier reports where claimant subsequently returned to work); *see also Banyai v. Berryhill,* 767 F. App'x 176, 179 (2d Cir. 2019) (summary order) (holding that the ALJ's determination that claimant was not disabled was supported by substantial evidence, particularly the plaintiff's work history). Plaintiff's improvement from treatment is also significant in evaluating his claim of disability. *See Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014) (summary order) (ALJ properly discounted treating physician's opinion because treatment records showed improvement); *Cohen v. Comm'r of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016) (summary order) (same); *Lopez v. Comm'r of Soc. Sec.*, No. 18-cv-

7564, 2020 WL 364861, at *17 (S.D.N.Y. Jan. 4, 2020) (affirming ALJ's decision not to give treating source opinion controlling weight because the record indicated that plaintiff's condition "show[ed] improvement with treatment"), *report & recommendation adopted*, 2020 WL 364172 (S.D.N.Y. Jan. 22, 2020). Thus, the ALJ properly considered Plaintiff's return to work and improvement with treatment when determining that Plaintiff was not disabled.[3]

### 2. Consultative Physicians' Opinions

Plaintiff also contends that the ALJ erred when it gave some weight to portions of Dr. Kaci's opinion and to the opinion from Dr. Bancks, a non-examining state agency physician, because these physicians did not have "the full picture of the severity of Plaintiff's conditions" and thus their opinions did not constitute substantial evidence. Pl. Mot. at 27-29. He also asserts that it was error to discount orthopedic specialist Dr. DeFeo's opinion. Pl. Mot. at 31-32. The Court disagrees.

It is well-established that a consultative examiner's opinion may constitute substantial evidence if otherwise supported by the record. *Grega v. Saul*, 816 F. App'x 580, 582-83 (2d. Cir. 2020) (summary order) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983)). The ALJ determined that a portion of Dr. Kaci's opinion from December 2014 that Plaintiff can frequently lift/carry up to fifty pounds and can continuously lift/carry up to twenty pounds was

---

[3] Plaintiff also asserts that the ALJ erred by not weighing all the factors in 20 C.F.R. §§ 404.1527 and 416.927 pursuant to SSR 96-2p. These factors include: (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527; *see also id.* § 416.927. While SSR 96-2p does apply (since Plaintiff's claims were filed prior to March 27, 2017), the Court finds that the ALJ duly considered all the necessary factors. In addition to what has already been discussed, the ALJ also noted that "Dr. Emili's treatment records and examinations span a long period and provide a good longitudinal perspective." R. at 1430; *see also* R. at 1432. While the ALJ failed to explicitly discuss all the factors for each of the medical opinions, this alone does not prevent the Court from according his decision meaningful review because the record permits the conclusion that the ALJ considered every factor in weighing the opinions. *See Reyes v. Colvin*, No. 13-cv-4683, 2015 WL 337483, at *16 (S.D.N.Y. Jan. 26, 2015), *adopting report and recommendation*; *see also Marquez v. Colvin*, No. 12-cv-6819, 2013 WL 5568718, at *12 (S.D.N.Y. Oct. 9, 2013).

entitled to great weight as it was supported by her clinical findings, Plaintiff's treatment records and reported daily activities. R. at 1432.[4] Dr. Kaci's opinion from September 2018 regarding Plaintiff's moderate postural limitations was given some weight by the ALJ because it was well-supported by the clinical findings and the totality of the medical evidence and other evidence of record. *Id*. Specifically, Dr. Kaci's September 2018 evaluation of Plaintiff revealed that he had full range of motion in his shoulders, elbows, forearms, wrists and fingers bilaterally and no muscle atrophy or sensory abnormality. R. at 1790. Further, Dr. Kaci's evaluation of Plaintiff revealed that while there was tenderness to palpation of the entire lumbar spine, there was no sacroiliac joint or sciatic notch tenderness, no spasm, no scoliosis or kyphosis, and no trigger points. *Id*. Plaintiff's straight leg raise test was also negative bilaterally. *Id*. This is consistent with the rest of the record as discussed above. Thus, the ALJ did not err by assigning portions of Dr. Kaci's opinion the weight he did.

The ALJ also did not err when he assigned Dr. Bancks July 2013 opinion some weight as his opinion was also consistent with the record.

Lastly, the ALJ did not err when he discounted Dr. DeFeo's July 2016 opinion that Plaintiff was disabled and had the capacity for less than sedentary work because while he did note a "mildly antalgic gait," "limited range of motion," "downgraded muscle strength," and "pain on palpation" of certain areas, and positive straight leg raise tests, records from as little as one month prior indicated that Plaintiff's pain had shown significant improvement with treatment. R. at 1433.

---

[4] The ALJ gave little weight to the part of the opinion that assessed that Plaintiff could sit for only four hours and stand/walk up to two hours each because it was not supported by the treatment record showing improvement with treatment or his ability to perform significant work activity after the alleged onset date. R. at 1432. Further, Dr. Kaci's notes showed that Plaintiff's pain and other symptoms improved with treatment. R. at 1432-33. The rest of Dr. Kaci's opinion regarding postural limitations was given some weight "given the nature of his impairments and subjective complaints." R. at 1433.

***

The record overall is inconsistent with Dr. Emili's, Dr. St Louis's, and Dr. DeFeo's opinions and consistent with certain portions of Dr. Bancks' and Dr. Kaci's opinions. Therefore, the Court holds that the ALJ properly weighed the medical opinions in the record.

### B.  The ALJ Properly Evaluated Plaintiff's Subjective Statements

Plaintiff claims that the ALJ did not properly evaluate his subjective statements. Pl. Mot. at 32-36. According to Plaintiff, the ALJ's evaluation of his statements was not supported by substantial evidence. *Id*. at 34. The Court disagrees.

The subjective element of pain is an important factor to be considered when determining disability. An ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment . . . in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984) (internal citation omitted). The intensity and persistence of the claimant's symptoms must be evaluated based on all the available evidence. *See* 20 C.F.R. §§ 404.1529(a)-(c) and 416.929(a)-(c). Additionally, if an individual alleges impairment-related symptoms, ALJs must:

> First . . . consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, . . . evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . .

SSR 16-3p (S.S.A.), 2016 WL 1119029 (hereinafter, "SSR 16-3p"). SSR 16-3p clarifies that:

> The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities . . .

In evaluating the "intensity, persistence, and limiting effects of an individual's symptoms," ALJs will also use the factors set forth in 20 CFR §§ 404.1529(c)(3) and 416.929(c)(3) which include:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p. However, ALJs are only required to discuss factors that are "pertinent to the evidence of record." *Id*.

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," however, Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. at 1427-28. Specifically, the ALJ found that while Plaintiff's "physical impairments result[ed] in some degree of functional limitation," the impairments were "not to the extent alleged." R. at 1428. In reaching this conclusion, the ALJ considered Plaintiff's daily activities as reported by Plaintiff, including his return to work, his conservative treatment history (including medication management, injections, and physical therapy) and the fact that the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain would not prevent Plaintiff from engaging in the given RFC. R. at 1430. Further, the ALJ noted that while the record contains various opinions from treating or examining physicians that Plaintiff is disabled, these were poorly supported. *Id*. Lastly, the ALJ concluded that Plaintiff's symptoms and related limitations (including Plaintiff's use of a cane) were not consistent with the evidence of record. R. at 1431.

Having considered the evidence in the record overall, the Court holds that the ALJ's determination that Plaintiff is not disabled and has the RFC to perform a wide range of medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) is supported by substantial evidence.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for judgment on the pleadings is **DENIED** and Defendant's cross-motion is **GRANTED.** The Clerk of Court is hereby directed to close this case.

**SO ORDERED.**

**Dated: September 14, 2021**
**New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**